The Tiedtke Stores Realty Company v. Commissioner.
Tiedtke Stores Realty Co. v. Commissioner
Docket No. 110166.
United States Tax Court
1944 Tax Ct. Memo LEXIS 374; 3 T.C.M. (CCH) 129; T.C.M. (RIA) 44037; February 10, 1944
*374 W. A. Belt, Esq., and A. J. Beran, C.P.A., 1434 Nicholas Bldg., Toledo, O., for the petitioner. T. F. Callahan, Esq., and Walker K. Wood, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding is for the redetermination of deficiencies determined by the Commissioner as follows: Income Tax
Excess Profits Tax
Year ended January 31, 1938
$10,448.67
$4,356.38
Year ended January 31, 1939
6,806.92
2,879.37
Three issues are presented; they are: (1) Whether petitioner realized taxable income on purchases made by it of its own bonds, in each of the taxable years, at costs less than the issuing prices; (2) Whether respondent properly disallowed portions of the depreciation deductions claimed in respect of two leases owned by the petitioner; and (3) Whether respondent properly disallowed portions of the depreciation deductions claimed for petitioner's buildings. The parties have filed a stipulation of facts which we adopt and incorporate herein by reference. Such parts thereof as are necessary to an understanding of the issues are included in our findings of fact, made also from evidence submitted at the hearing. Findings *375 of Fact The petitioner is a corporation, organized under the laws of the State of Ohio in 1925, and having its principal office in the City of Toledo, Ohio. It filed its income tax returns for the taxable years with the collector for the tenth district of Ohio. During the taxable year ended January 31, 1938, the petitioner purchased bonds previously issued by itself, having a face value of $58,300, at a cost of $52,205.50. During the taxable year, ended January 31, 1939, it purchased bonds previously issued by itself, having a face value of $37,100, at a cost of $31,705.46. The amounts of the discounts were not reported as taxable income on petitioner's returns for either year. The balance sheets of the petitioner, as of the close of its fiscal years ended January 31, 1937, January 31, 1938, and January 31, 1939, are as follows: Year Ended
Year Ended
Year Ended
ASSETS
Jan. 31, 1937
Jan. 31, 1938
Jan. 31, 1939
Cash
$ 16,575.20
$ 1,535.90
$ 1,241.25
Accounts Receivable
8,262.72
18,250.24
22,961.54
Bonds in Escrow
94,239.00
79,124.00
71,096.50
Sinking Fund
32,123.99
26,541.27
26,602.00
Stock in Domestic Corporations
23,280.85
26,250.16
28,057.97
Main Building (less reserve for depreciation)
479,870.02
437,710.02
395,550.02
Leases and Improvements (less reserve for amortiza-
tion)
29,827.57
23,333.70
16,839.83
Furniture and Equipment (less reserve for deprecia-
tion)
5,490.93
5,287.77
5,084.61
Deferred Charges
12,916.58
11,443.20
7,795.97
Sundry Other Assets
33,936.84
TOTAL
$736,523.70
$629,476.26
$575,229.69
LIABILITIES AND CAPITAL
Accounts Payable
$160,731.79
$108,195.44
$ 78,996.28
Bonds Payable
672,000.00
594,900.00
560,900.00
Accrued Expenses
25,273.59
23,392.42
22,430.93
Reserve for Federal Income Taxes
0
3,900.00
1,788.65
Reserve for Building Restoration
18,000.00
18,000.00
18,000.00
Capital Common Stock
200,000.00
200,000.00
200,000.00
Surplus
* (339,481.68)
* (318,911.60)
* (306,886.17)
TOTAL
$736,523.70
$629,476.26
$575,229.69
*376 The fair market value of the assets shown on the balance sheets was not in excess of the book values there reflected. On November 1, 1928, petitioner, as lessee, leased a piece of property for a period of ten years and five months, the term expiring April 1, 1939. The lease was known as the Manhattan lease, and hereinafter will be referred to by that name. Upon acquiring the Manhattan lease, petitioner expended $15,765 in improving the demised property. During 1934, it paid the sum of $1,000 as a commission for securing an extension of the term. The extension agreement was actually entered into on September 1, 1936, and provided for an extension for a period of 13 years and five months from that date, to February 1, 1950. The Manhattan lease was in existence during the taxable years here involved. On November 9, 1928, petitioner purchased a lease known, and hereinafter referred to, as the Secor lease, at a cost to petitioner of $55,000. The lease bore dated April 1, 1919, and expired 20 years thereafter, on April 1, 1939. During 1929, petitioner expended $28,510.17, and during 1932 expended $3,019.85, in improving the leased property. On June 1, 1934, *377 the term of the lease was extended to June 1, 1944, and on January 1, 1936, was again extended to December 31, 1955. The Secor lease was in existence during the taxable years here involved. The properties covered by both the Manhattan lease and the Secor lease were used by the petitioner in its business. The aggregate of the cost of improvements and the commission paid for securing the extension of the Manhattan lease, and the original cost of purchasing and the subsequent expenditures for improvements on the Secor lease was $103,295.02. That amount, less $73,467.45, the accumulated reserve for amortization up to the close of the year ended January 31, 1937, was carried on petitioner's books, and reflected on its January 31, 1937 balance sheet as an asset. The balance sheet of January 31, 1938, reflects an addition to the reserve, for the year ended on that date, in the amount of $6,493.87, and a corresponding reduction in book value of the asset account carried for the leases, from the January 31, 1937, amount of $29,827.57 to $23,333.70. The January 31, 1939, balance sheet reflects a like addition to reserve and a corresponding reduction of book value of the asset to $16,839.83, *378 as of that date. The additions to reserve were included in the amounts deducted for depreciation on petitioner's returns. In 1925, the petitioner, as lessee, obtained a 99-year lease expiring in the year 2024 on certain lands in the City of Toledo, Ohio. The leased premises consist of two parcels. The first is a lot having a frontage of 70 feet on the easterly side of Summit Street, and a depth of 120 feet. The second is a larger parcel of irregular shape, lying in the rear of the first, and separated from it by an alley 20 feet in width. A building, erected on the leased premises in 1910, consists of two portions. One, of five stories, a basement and sub-basement, stands on the Summit Street lot, and the other, of six stories, a basement and sub-basement, stands on the larger lot in the rear, the ground level of which is markedly lower than that of the Summit Street lot. The two portions of the building are separated at street level by the alley running between them, but their upper floors are built across the alley in such a manner that the two portions are connected. Rent payable by the petitioner under its 99-year lease was $57,750, annually. The lease granted petitioner an *379 option to buy the fee to the land for $825,000. It further provided that upon the removal of the present or any future buildings on the leased land, any new building to be erected thereon should not be less than six stories in height, and be worth not less than $800,000. At the time it acquired the lease in 1925, the petitioner purchased the building standing on the land at a cost of $1,054,000. On August 1, 1925, it leased the land and building to Kobacker Stores, Inc., for a 20-year term at an agreed annual rental of $250,000. In addition to the rent, the lessee agreed to pay certain taxes and other charges, and all obligations of the petitioner under the 99-year lease, with the exception of the ground rent and certain taxes and interest for which the petitioner was liable thereunder. Kobacker Stores, Inc., was liable also, as guarantor, for the performance by petitioner of all of its obligations under the 99-year lease. On August 1, 1931, petitioner agreed to a reduction of rent under the lease to Kobacker Stores, Inc., to $125,000 annually for a period of five years. At the expiration of that period, the rent was raised to $160,000 annually, and the term extended from July 31, *380 1945, to July 31, 1950. Kobacker Stores, Inc., was required, under its lease, to keep in good order and repair the buildings, sidewalks and improvements then situated or thereafter erected on the leased premises. So long as the lessee was not in default in the performance of its obligations under the lease, it had the right to make such alterations and changes in the building as might be necessary for the proper conduct of its business. In 1939, Kobacker Stores, Inc., purchased the fee to the leased land for $750,000. Petitioner, thereafter, paid the ground rent under the 99-year lease to Kobacker Stores, Inc.
Neither the 99-year lease nor the lease to Kobacker Stores, Inc., was reflected on petitioner's balance sheets as of any value, nor otherwise carried as an asset. From the time of its erection in 1910, petitioner's building has always been used as a retail department store, known as Tiedtke's Store. Kobacker Stores, Inc., has continued the use of that name since it leased the premises in 1925. Only the first three floors of the building are utilized for selling. The first floor is used entirely as a large food market; the second floor is given over to clothing and soft goods, *381 and the third floor to household goods and furniture. The building itself is of mill type construction, having brick walls, steel beams, steel columns, wooden joists, wooden floors and metal ceilings. It is not fireproof. Low ceilings of from 14 to 16 feet make proper lighting difficult. Large numbers of supporting columns are so arranged that counters can not be laid in continuous straight lines, and space for free circulation of customers is therefore inadequate. The building will reach the end of its useful life not later than July 31, 1950. The portion of Summit Street on which the building in question is located was in the center of the Toledo retail shopping and business district in 1910 and for several years thereafter. During 1928 and 1929, some of the larger department and retail stores, and other leading business establishments which had been located there, began moving to a more newly developed business section, beginning about two blocks westerly of petitioner's building. The trend toward that section continued during the early years of the 1930's. The Summit Street buildings formerly occupied by the larger establishments remained vacant in some instances, and in others *382 were occupied by tenants who remained for comparatively short periods, operating such establishments as inexpensive credit clothing stores, newsstands, small food markets, and variety stores. As a result, vacancies in the section increased, and rental values dropped during the period from 1925 to 1937, in some instances as much as 50 to 75 per cent. Market values also dropped as the result of the downward trend in the character of the section. In 1935 a four-story building, having a 40 foot front on Summit Street, was sold for $40,000, or approximately one-half of the value at which it was assessed for property taxes. It had previously been occupied by a ladies' clothing store at an annual rental of $13,000. In 1940, a large shoe store in the district, which had brought an annual rental of $20,000, sold for $25,000. In 1940 a four-story department store building, having a frontage of 120 feet on Summit Street, directly opposite the petitioner's building, and valued for taxation at $393,000, was sold, with all interior fixtures, for $270,000. No new buildings have been built in the section of Summit Street in which petitioner's building stands since about 1915. During the same period, *383 in the newer section lying to the west, a new theater building, three or four large business buildings and a twenty-seven story bank building have been erected. During its fiscal year ended January 31, 1938, Kobacker Stores, Inc., made a profit of $58,000, after making provision for Federal taxes. During the year ended January 31, 1939, it sustained a loss of $64,000 after providing for Federal taxes. During the year ended January 31, 1940, it made a profit of $47,574 before making provision for Federal taxes, and for the year ended January 31, 1941, made a profit of about $125,000, before providing for Federal taxes. The average profit over the four-year period represented a return of 3.6 per cent of its own investment, exclusive of that of the petitioner. In the period from 1925 to 1929 it had realized an average return of about 20 per cent. In 1937, Kobacker Stores, Inc., employed architects to submit plans for the remodeling of or rehabilitation of the petitioner's building. Plans submitted in 1940 estimated the total cost at $600,000. Contracts had been awarded for part of the work, amounting to $213,000, and the work had actually been undertaken. Within two or three weeks, *384 however, when all plans were completed, and the total cost estimated, Kobacker Stores, Inc., decided not to make the expenditure. Representatives of both the firms of architects which had been employed were of the opinion that no alteration could bring about a satisfactory result, and that the building had then already become functionally obsolete. As of January 31, 1932, the petitioner's books reflected the undepreciated cost of its building as $711,750.02, being the original cost less $342,249.98, the amount of accumulated depreciation, computed at the rate of 5 per cent, claimed by and allowed to petitioner, since its acquisition of the building. Petitioner continued to compute depreciation at the rate of 5 per cent of cost for its fiscal years ended January 31, 1933, and January 31, 1934, claiming $52,700 for each year. In subsequent years, including the taxable years here involved, it computed depreciation at the rate of 4 per cent of cost, claiming $42,160 in each year. Corresponding additions to reserve resulted in reductions of the book value of the building to $437,710.02 at the close of the year ended January 31, 1938, and $395,550.02 at the close of the year ended January *385 31, 1939. Net income, or loss, computed without regard to any deduction for depreciation, was reported by the petitioner on its returns as follows: Year Ended
Net income (or loss)
January 31, 1933
* ($104,176.26)
January 31, 1934
* ( 7,431.91)
January 31, 1935
19,083.98
January 31, 1936
12,027.89
January 31, 1937
41,143.63
*386 Footnotes
*. ( ) denotes deficit.↩
*. ( ) denotes loss. On its return for each of the taxable years, the petitioner claimed a deduction of $48,857.03 for depreciation, representing the aggregate of the additions to reserve for building depreciation, additions to reserve for amortization of the Manhattan and Secor leases, and additions to reserve for depreciation of furniture and equipment. The respondent determined that the depreciation deductions were excessive, each by $30,208.62, and that the amount allowable for each of the taxable years was $18,648.41. He determined further that the petitioner realized taxable income in each of the years here involved in connection with the purchase of its own bonds at discount. Reported net income for each year was accordingly adjusted by the addition thereto of $30,208.62 for excessive depreciation, and the further addition of the discount applicable to each year's purchase of bonds, namely, $6,094.50 for the year ended January 31, 1938, and $5,394.54 for the year ended January 31, 1939. Opinion We may briefly dispose of the first issue, arising out of the petitioner's purchases of its own bonds. Since the trial and filing of briefs, the parties have stipulated that the Court may find as fact and conclusion of law that $3,047.25 and $2,697.27 represents taxable gain on purchase or retirement of petitioner's own mortgage bonds during the taxable years ended January 31, 1938, and January 31, 1939, respectively. We so find and hold, and this renders it unnecessary to make further findings or render further opinion on the first issue. This leaves for consideration the additions to reserve for depreciation upon the building, furniture and equipment, and the amortization of two leases. Making up the $48,857.03, deducted by the petitioner for depreciation in each of the taxable years, were the amounts of $42,160 claimed on its building, $6,493.87 for amortization of the Manhattan and Secor leases, and $203.16 for depreciation of furniture and equipment. The evidence does not disclose the extent to which each of those assets figured in the respondent's determination that the deductions were excessive by $30,208.62, nor do we know what rates the respondent used in recomputing depreciation. The petitioner assigns as error the determination that the rates used by it and the amounts which it deducted were excessive, and the respondent's failure to restore to asset accounts excessive depreciation claimed in years prior to the taxable years, resulting from the use of the rates which respondent determined to be proper. Nothing is said in petitioner's briefs with regard to any adjustment that may have been made affecting depreciation on furniture and fixtures, the argument being directed entirely to amounts allowable on the building and the two leases. At the close of the petitioner's fiscal year ended January 31, 1937, the undepreciated balance of cost of its building was $479,870.02. The undepreciated cost of the Manhattan and Secor leases was $29,827.57 in the aggregate. We have found as fact that the building will reach the end of its useful life not later than July 31, 1950, that the Manhattan lease will expire February 1, 1950, and that the Secor lease will expire December 31, 1955. It would be a matter of simple calculation to compute the depreciation allowable in respect of those assets but for the petitioner's contention that the amounts claimed on its returns in prior years should be restored to base to the extent that those deductions did not serve to reduce taxable income. The Supreme Court has recently ruled against such a contention in . Petition for rehearing was overruled October 11, 1943. The Court held that a deduction which has not been challenged by the Commissioner must be said to have been "allowed," and that the basis for depreciation is to be adjusted accordingly, regardless of the fact that the deduction may have resulted in no tax benefit to the taxpayer. In the instant case, the petitioner not having shown the contrary, we assume that the depreciation deductions claimed in prior years have not been challenged by the Commissioner. Upon this point, therefore, the case is controlled by the Virginian Hotel case. We hold that the undepreciated balance of cost of petitioner's building and of the Manhattan and Secor leases furnish the proper basis for computation of depreciation, and that the petitioner is not entitled to have restored to base any part of the deductions taken in prior loss years. What portion of $29,827.57, the aggregate of the undepreciated cost of the Manhattan and Secor leases, is allocable to each does not appear. We leave the question for settlement under Rule 50. Decision will be entered under Rule 50.↩